# IN THE UNITED STATES DISTRIC COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No. 20-1597

GERRY TRACY, an individual,

    Plaintiff,

v.

SUNCOR ENERGY (U.S.A.) INC., a Delaware corporation,

    Defendant.

## COMPLAINT AND JURY DEMAND

Plaintiff Gerry Tracy ("Mr. Tracy" or "Plaintiff"), by and through counsel, brings this action against Defendant, Suncor Energy U.S.A. Inc. ("Defendant" or "Suncor") and hereby states and alleges as follows:

## INTRODUCTION

1. On November 28, 2018, Suncor unlawfully and willfully terminated Mr. Tracy from his managerial position because of his age.

2. Mr. Tracy worked with Suncor for 38 years when Defendant fired him for the pretextual reason that he was allegedly involved in a significant "scrap metal for cash" scheme, in violation of Suncor policy, purportedly run out of the Commerce City, Colorado refinery.

3. In Mr. Tracy's 38 years of service to Suncor, he received only exemplary evaluations from superiors and praise from co-workers; Mr. Tracy maintained an unblemished disciplinary record.

1

4. As a result of Defendant's illegal conduct, Mr. Tracy has suffered loss of wages and benefits, humiliation, severe emotional distress, loss of enjoyment of life, and other significant injuries, damages, and losses.

## JURISDICTION AND VENUE

5. This Court has federal question jurisdiction over the action pursuant to 28 U.S.C. § 1331.

6. Venue is proper in this Court pursuant to 28 U.S.C. § 1391. The employment practices alleged herein to be unlawful were committed within the jurisdiction of the United States District Court for the District of Colorado.

7. The action is authorized and instituted pursuant to the Age Discrimination in Employment Act ("ADEA"), as amended, 29 U.S.C. § 621, *et seq*.

## ADMINISTRATIVE PREREQUISITES

8. Mr. Tracy timely filed his Charge of Discrimination with the Equal Employment Opportunity Commission and received his Notice of Right to Sue on March 5, 2020. Mr. Tracy has met and exhausted all administrative prerequisites. This case is timely filed.

## PARTIES

9. Mr. Tracy is a legal resident of the United States and was, at all relevant times, a resident of and domiciled in the State of Colorado

10. Mr. Tracy was, until November 2018, an employee of Suncor.

11. Mr. Tracy was born on May 3, 1960.

12. Upon information and belief, at all relevant times, Defendant has continuously been an employer within the meaning of the ADEA.

## FACTUAL ALLEGATIONS

*Gerry Tracy's 38-year Career Working with Suncor*

13. Mr. Tracy, aged 58 at the time of his termination, devoted almost his entire career to Suncor, working at the company's refineries for approximately 40 years.

14. In 1980, fresh out of school, Mr. Tracy accepted a position with Jacobs Engineering as an embedded contractor at Suncor. The contractor assigned him to work as an Apprentice Electrician at Suncor's refinery in Sarnia, Ontario, Canada. This entry-level position sparked an intense loyalty in Mr. Tracy to Suncor, which he carried from position to position as he rose in the ranks with both the contractor and with Suncor.

15. After three years of tutelage as an apprentice, Mr. Tracy received a promotion to Electrician. He held this position, also at the Sarnia, Ontario refinery, for seven years. During this time, Mr. Tracy earned a reputation as a loyal and hard worker from his managers and supervisors. He quickly received another promotion to serve as an Electrical and Mechanical Planner. He spent four years in this position.

16. In 1994, Mr. Tracy determined he was ready for a new challenge and accepted a role in management at the Sarnia, Ontario refinery. For the next six years, he served as supervisor in various departments at the refinery. Each role earned Mr. Tracy exemplary evaluations from his superiors.

17. Mr Tracy was next promoted to Site Maintenance Manager at the Suncor's Sarnia, Ontario refinery and held this position until 2005. During his time in his various management roles at the Sarnia, Ontario refinery, Mr. Tracy sat on numerous Suncor committees and acted as the team leader for the refinery rescue team.

18. In 2005, Mr. Tracy, at the behest of his superiors, accepted another promotion, and relocated from the Sarnia, Ontario refinery to Suncor's Commerce City, Colorado refinery. Suncor tasked him with leading a supplementary maintenance team at the refinery.

19. Suncor then recruited Mr. Tracy to lead and execute its 2006 "turnaround." A refinery turnaround generally occurs in five-year cycles. During the turnaround process, Suncor shuts down a plant at the refinery or takes it off stream in order to conduct maintenance, inspection, and testing of all components.

20. In 2007, after leading and completing a successful turnaround, Mr. Tracy opted to depart Commerce City, and Suncor, to oversee another turnaround at a plant for Syncrude Canada in Ft. McMurray, Alberta, Canada. For the span of 2007, Mr. Tracy worked on this project.

21. In 2008, at the completion of the Ft. McMurray refinery turnaround, Suncor offered, and Mr. Tracy accepted, an opportunity to return to the Commerce City facility to become the Maintenance Manager. Here, he left his role as an embedded contractor and became a direct employee of Suncor. He held this role for six years before accepting another promotion and serving as Director of Maintenance for 18 months.

22. Suncor created a new position and role specially tailored to Mr. Tracy's skillset and management style. He became Suncor's turnaround specialist receiving work exclusively on the 2016 Turnaround. After that assignment, Suncor promoted Mr. Tracy to Executional Manager for Capital Products—Turnarounds. Mr. Tracy remained in this position for nearly ten years until Suncor unlawfully terminated him in November 2018.

23. Mr. Tracy earned only positive evaluations. His job performance evaluations for the positions held during his 38 years of service rated "Exceptional," "Strong," and "Successfully Meets Expectations."

24. Toward the end of his employment, a direct supervisor made inquiries into the potential dates Mr. Tracy intended to retire. The direct supervisor also sought information on Mr. Tracy's retirement plans. Mr. Tracy informed his direct supervisor that he planned to retire in 2021 after the next plant turnaround.

25. Mr. Tracy found the inquiries into his employment status odd, especially considering the refinery manager Donald Austin's comments at a staff meeting where he explained that Suncor had lost its crude price advantage of a long-term price, had extremely high overhead, and needed to make immediate reductions where the company could.

*The "Scrap for Cash" Program*

26. Upon information and belief, some years prior to November 28, 2018, and well before Mr. Tracy assumed the role of maintenance manager or his role as Executional Manager, employees began taking surplus material generated at the refinery to a local recycling company to sell for scrap.

27. Upon information and belief, employees generally expended the funds received to purchase tools or equipment for communal use at the refinery.

28. Despite Suncor's claims to the contrary, Mr. Tracy was not aware of the exact breadth of the scrap selling program at the refinery, especially during his time as an embedded contractor. In 2012, Mr. Tracy did become aware of two occasions where employees sold material for scrap to acquire tools for the maintenance department. Mr. Tracy subsequently

5

informed the investigators of these instances and was under the impression that the program originated well before Suncor hired Mr. Tracy.

29. On the first occasion in 2012, two onsite electricians sold wire for scrap and used the funds to procure tools. The electricians did not directly report to Mr. Tracy. A foreman managed the general workflow and day-to-day oversight of the electricians. A low-level supervisor directed the foreman. Mr. Tracy managed the low-level supervisors. Next, two pump mechanics sold old motors for scrap and used the funds to buy maintenance equipment. Again, the mechanics did not directly report to Mr. Tracy. He sat two links up the chain of command. Mr. Tracy believed that these occurrences represented two isolated incidents at the refinery and not an ongoing unlawful cash for scrap ploy.

30. However, upon information and belief, these two departments consisting of electricians and pump mechanics, without Mr. Tracy's knowledge or approval, continued to sell material for scrap. Upon information and belief, these groups and others (pipefitters, instrument leads) apparently kept cash boxes, including managers not under Mr. Tracy, onsite to secure the funds acquired from scrap sales.

31. Upon information and belief, multiple members of Suncor management authorized the 2012 wire and motor sales and the ongoing scrap sales. Upon information and belief, at minimum, three members of management either approved the sales verbally or via e-mail, including Mr. Tracy's superiors.

32. Upon information and belief, Maintenance Manager Sam Cooper authorized sales and had firsthand knowledge of the ongoing practice.

33. Upon information and belief, Maintenance Manager Perry Herrick, ultimately Mr. Tracy's direct supervisor, had full knowledge of the practice.

34. Upon information and belief, the Director of Maintenance and Turnaround, Darren Erickson, Mr. Herrick's supervisor, had full knowledge of the practice.

35. In fact, upon information and belief, Mr. Erickson conducted an internal investigation into the practice in 2012, including the sale of the wire and the motors, and took no action against any employee. Suncor neither instigated disciplinary action against nor terminated any employee.

36. Upon information and belief, in 2017 or 2018, an employee reporting to Mr. Herrick allegedly devised and orchestrated a highly calculated scrap for cash scheme that ran afoul with Suncor policies. The employee started transporting materials to the recycling company to sell for scrap and using the funds for duplicitous means. It is unclear to Mr. Tracy whether any of the employee's direct supervisors, or any of the managers in the chain of command, authorized any of this employee's transactions.

37. Upon information and belief, the employee initially used the cash obtained to purchase new tools to support his job at the refinery. However, upon information and belief, the employee began depositing the cash obtained from selling excess material for scrap into his personal bank account. Mr. Tracy did not authorize or have knowledge of these ongoing activities.

38. Suncor's investigation found no money transfers into any accounts owned by Mr. Tracy, found no photographs or any camera footage of him at the scrap dealer, or any evidence that he ever handled money from scrap sales or that he profited in any way from any sale.

39. Upon information and belief, the employee removing the material to sell for scrap and depositing the monies received from the scrap into his own bank account, became upset when he discovered that a subcontractor at the refinery removed a roll of wire from the facility to

sell for scrap. The employee apparently informed Suncor management sometime in 2018 of the subcontractor's dealings.

40. Upon information and belief, the practice of selling excess material generated at the refinery to the local recycling dealer was a widely known and approved program at Suncor.

41. Upon information and belief, the practice consisted of loose guidelines and a chain of authorization.

42. The employee's complaint to Suncor management prompted an investigation into the selling of scrap to the local recycling dealer.

43. Upon information and belief, the investigation was conducted internally and covered three months. The investigation ultimately circled back to the employee that made the initial complaint against the subcontractor. The investigators determined that the employee engaged in unauthorized and unapproved activity related to selling material for scrap and misused at least some of the funds he acquired.

44. When the extent of this employee's activities became clear to the company investigators, Suncor immediately fired the employee.

45. As part of Suncor's internal investigation, Mr. Tracy was interviewed extensively. The two interviews he underwent ultimately devolved into a sham interrogation with investigators appearing to circle the wagons in an effort to cut overhead even after discovering the true culprit. Mr. Tracy rightfully explained to the investigators that he knew nothing of the employee's misuse of the scrap program for personal gain.

46. Further, Mr. Tracy informed the investigators that, outside of the two sales in 2012, he was only vaguely aware that employees, managers included, collected excess material generated at the refinery to sell for scrap. Mr. Tracy was also minimally aware that employees

sold the scrap to buy tools and other equipment for communal use at the facility, which, upon information and belief, is a known of and approved activity at the refinery.

47. Mr. Tracy was never identified personally or via any receipts from any scrap dealer as being a participant in any form in the alleged unauthorized scrap for cash scheme orchestrated by the fired employee. When he learned of the employee's activities, he was dumfounded as he knew this individual for some time, even on a personal level, and never caught wind of any of the alleged illicit activities.

48. Despite the investigators' malicious and humiliating press during the interrogation and despite the numerous accusations heaped upon him by Suncor, Mr. Tracy was cleared of any wrongdoing.

*Mr. Tracy's termination*

49. Sometime in November 2018, Suncor transferred Mr. Tracy to the nightshift to execute an important capital project.

50. On November 28, 2018, the site director called Mr. Tracy into his office. When Mr. Tracy arrived, he encountered the director as well as a member from human resources. At this meeting, the director terminated Mr. Tracy's employment after close to 40 years of exemplary service to the company and gave him three days to organize his affairs.

51. Outside of the primary offender who abused this scrap for cash program, Mr. Tracy was the only other individual to lose his job, despite the investigation ultimately clearing him from any wrongdoing.

52. The investigation did find other, younger, employees, including younger employees in similarly situated positions as Mr. Tracy, culpable to various degrees in misuse of funds from scrap sales. However, Suncor did not terminate any of these employees.

53. Upon information and belief, at most, the employees only received reprimands or minor disciplinary action.

54. Suncor replaced Mr. Tracy with an employee in his mid-30s. Suncor also investigated this employee's activities as related to the scrap program. The investigators found that the employee hired to replace Mr. Tracy authorized at least two subordinates to take materials to sell to the scrap dealer. The employee received minimal reprimand for the incidents. Instead, upon information and belief, Suncor promoted the employee to Mr. Tracy's position albeit without increasing his salary.

55. Just prior to his termination, Mr. Tracy was approaching the maturing of his restricted share units ("RSU") and close to receiving his annual bonus. Combined, Mr. Tracy's annual bonus and the maturing of the RSUs amounted to approximately $130,000.00.

56. The payout was due in approximately 33 days from the date of Mr. Tracy's termination. Suncor, attempting to reduce overhead at the refinery and admittedly looking for ways to significantly reduce costs, saved a significant sum by unlawfully terminating Mr. Tracy.

*Suncor's inconsistent rationales for Mr. Tracy's termination*

57. Defendant has already articulated an inconsistent basis for its decision to terminate Mr. Tracy yet only discipline other employees for alleged wrongdoing, even measured by its own standards (i.e. making disciplinary determinations based on employee rank, years of service etc. measured against culpability).

58. First, Defendant claims Mr. Tracy was deeply involved in the unauthorized recycling of scrap. Defendant has provided no evidence for this claim (other than stating that other employees, desperate to preserve their jobs, allegedly told investigators Mr. Tracy played a role in the recycling activity). This despite the investigation clearing him of wrongdoing and

providing no evidence that Mr. Tracy had any knowledge of the illicit scrap for cash scheme orchestrated and carried out by a rogue employee.

59. As to the 2012 sales that Mr. Tracy did have knowledge about, an investigation at the time determined that neither he, nor apparently any other employee, did anything wrong. Mr. Tracy had no further knowledge of the recycling program and had no knowledge of the illicit scrap sales beginning in either 2017 or 2018, despite losing his position because of these sales. It is unclear as to what sales Defendant bases it termination on because it has not released the findings of the investigation.

60. Upon information and belief, multiple managers and directors authorized in writing the sale of scrap. Mr. Tracy neither authorized the sale of scrap in writing or verbally. Moreover, upon information and belief, there were several managers and staff employees that had intimate knowledge and/or actively participated in the well-established, historical scrap selling practice at the site. One individual was the spouse of a prominent director in the organization. Another was the past director of maintenance. There were three pump shop managers involved in the practice as well as a maintenance manager. Each of these individuals had active cash boxes reaping the rewards of scrap sales.

61. The difference between these individuals and Mr. Tracy: they did not lose their jobs as a result of the investigation, had active roles in the practice, and just happened to be considerably younger than Mr. Tracy. For example, Mr. Herrick and Mr. Erickson both had direct knowledge of the practice at Suncor and took no action to report or trigger an investigation, an accusation Defendant argues as a reason for Mr Tracy's termination. Yet, Suncor did not terminate either employee. Both are considerably younger than Mr. Tracy.

62. Second, Defendant claims that Mr. Tracy directly approved unauthorized scrap metal recycling, and that he facilitated it by failing to stop it or report it to his supervisors, despite being in a position to do so. This statement is clear evidence of the pretextual nature of Defendant's reasoning and of Plaintiff's disparate treatment, as at least two other younger managers either at or above Mr. Tracy's level and multiple other managers (including the younger employee that replaced him) also facilitated the unauthorized scrap recycling by failing to stop or report it. Further, Mr. Tracy never authorized any recycling of scrap but simply had knowledge of two, apparently authorized sales in 2012. If now the 2012 sales are unauthorized, then the disparate treatment based on Mr. Tracy's age is even more evident.

## CLAIM FOR RELIEF

**(Age Discrimination in Violation of ADEA, as amended, 29 U.S.C. §§ 621, *et seq.*)**

63. Plaintiff reasserts and re-alleges the allegations set forth above.

64. At all times material herein, Plaintiff has been entitled to the rights, protections, and benefits provided under the ADEA, 29 U.S.C. §§ 621, *et seq.*

65. Defendant treated Plaintiff less favorably than his similarly situated younger counterparts in the terms and conditions of their employment as they received only minor disciplinary action and maintained their employment, while Mr. Tracy, cleared of any wrongdoing, was terminated.

66. At all relevant times, Plaintiff performed the functions of his job competently and was qualified for his position with Suncor.

67. Defendant terminated Plaintiff's employment because of his age. Age was the motivating factor in Defendant's decision to terminate each Plaintiff.

68. Defendant has engaged in a pattern and practice of age discrimination in the terms and conditions of employment, including but not limited to retaining younger employees who engaged in worse conduct than Plaintiff, as determined by the findings of its own internal investigation.

69. Defendant replaced Plaintiff with a much younger employee that received only disciplinary action as a result of the investigation.

70. Defendant discriminated against Plaintiff on the basis of age and caused him severe injuries, damages, and losses.

71. Defendant's discriminatory conduct was willful and in knowing or reckless disregard of the requirements of the ADEA.

72. As a consequence of Defendant's violation of the ADEA, Plaintiff has sustained significant economic and consequential damages.

## CONCLUSION

WHEREFORE, Mr. Tracy respectfully requests that this Court enter judgment in his favor against Defendant, and award Mr. Tracy all relief as allowed by law, including, but not limited to, the following:

   a. Declaratory relief and injunctive relief, as appropriate;

   b. Actual economic damages as established at trial;

   c. Compensatory damages, including, but not limited to those for future pecuniary and non-pecuniary loses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses;

   d. Punitive damages for all claims as allowed by law in an amount to be determined at trial;

    e.   Liquidated damages for all claims as allowed by law;

    f.   Pre- and post-judgment interest at the highest lawful rate;

    g.   Attorneys' fees and costs; and

    h.   Such other and further relief as justice requires.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

DATED:  June 3, 2020.

                WHITCOMB, SELINSKY, P.C.

            By:  <u>/s/ Timothy J. Turner</u>
                  Timothy J. Turner, Esq.
                  2000 S. Colorado Blvd.
                  Tower 1, Suite #9500
                  Denver, CO 80222
                  Tel:  303-534,1958
                  Fax:  303534-1949
                  Email:  tim@wsmlawpc.com

                  *Counsel for the Plaintiff, Gerry Tracy*